Mullins v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-161-CR

HENRY FRANKLIN MULLINS, JR. APPELLANT

A/K/A HENRY FRANKLIN MULLINS 

V.

THE STATE OF TEXAS STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

A jury found appellant, Henry Franklin Mullins, Jr. a/k/a Henry Franklin Mullins (Mullins), guilty of (1) the manufacture of one to four grams of a controlled substance, namely methamphetamine, and (2) possession of a precursor to methamphetamine, namely pseudoephedrine, with the intent to manufacture methamphetamine.  The trial judge then sentenced Mullins to forty years’ imprisonment for each conviction to run concurrently.
  
In five issues on appeal, Mullins challenges the legal and factual sufficiency of the evidence supporting his convictions and argues that the jury was improperly charged on the law of parties.  We affirm.

II.  Background Facts and Procedural History

On December 27, 2002, there was an explosion and fire inside Apartment 9 at the Spring Oak Apartment complex located at 124 Roberts Cutoff in Fort Worth, Texas.  At the time of the fire, Apartment 9 was leased to Mullins. 

Lori Duncan, the manager of the apartment complex, testified that on the day of the fire she was getting an apartment ready for a tenant when she was approached by Mullins, who indicated that he was making a cake and needed to borrow a blender.  She testified that although Mullins had requested a blender, she handed him a mixer because he had said he was making a cake. She stated that when she handed Mullins the mixer he said, “well, I guess that will work,” to which she replied, “well, you said you’re making a cake.”  The record then reflects that either Duncan or Mullins handed the mixer to a person accompanying Mullins, identified by Duncan as someone who occasionally stayed with Mullins and whom she knew as “Joe” or “Joe Don,” and that Joe Don took the mixer and left while Duncan and Mullins continued to talk. 

Duncan testified that she and Mullins were standing by the stairs when “all of a sudden we heard this loud noise, and he just got this look on his face.” Duncan stated that Mullins then ran into his apartment and returned to request a fire extinguisher.  Duncan testified that after she provided Mullins with a fire extinguisher, he went back into his apartment, and that is when he came back out and told her everything was okay, that the fire was out.  When Duncan asked Mullins what happened, he stated, “it just caught on fire.”  Duncan testified that when she told Mullins she was going to call the fire department he told her not to as the fire was already out.  She testified that she told Mullins she was going to call the fire department anyway.  She stated that while she was waiting for the fire department, Mullins and Joe Don came out of the apartment, told her they were leaving to “get some stuff to fix the bathroom,” and left, leaving the door of the apartment open.  

After Mullins and Joe Don left, Duncan testified that she and another resident of the apartment complex, Gary Perkins, went inside Mullins’s apartment.  Duncan testified that while inside Mullins’s apartment she observed thick black smoke, a patch of burned carpet in the entryway leading to the bedroom, and a melted bathtub.  She testified that the carpet was new and that the bathtub was not melted when she leased the apartment to Mullins in September of 2002.  Duncan also testified that based upon information she received from Perkins, she and Perkins went inside Apartment 6, a vacant apartment, where she observed “some gas cans or whatever in the bathtub in the apartment.” 

Perkins testified that on December 27, 2002 he was a resident of the Spring Oaks Apartment complex and that on that date he “heard a bunch of commotion.”  He testified that he observed smoke coming out of Apartment 9 and that he saw Mullins’s “roommate,” whom he indicated he knew as “Joe,” take a five-gallon can from the apartment to the dumpster.  He also testified that he witnessed Mullins and Joe take “four more things out of the apartment” and put them into Apartment 6, which he believed to be vacant.  He stated that he then saw both men leave in a pickup truck.  Perkins testified that after Joe and Mullins left, he accompanied Duncan inside Mullins’s apartment where he observed that the carpet was “singed” and that the tub was “all black and melted.”  Perkins also testified that on previous occasions he had noticed a “sulfur-type smell” coming from Mullins’s apartment. 

Officer John Gottlob of the Fort Worth Police Department testified that on December 27, 2002 he executed a search warrant for Apartments 6 and 9 and that upon entering Apartment 9 he observed certain items that in his experience he had seen used in methamphetamine labs.  He also testified regarding the procedure or process for manufacturing methamphetamine utilizing the Nazi or Birch reduction method, the ingredients being pseudoephedrine, lithium or sodium metal, anhydrous ammonia, and hydrochloride gas.  He testified that pseudoephedrine can be extracted from cold tablets,
(footnote: 2) lithium metal can be taken from batteries, anhydrous ammonia can be made from fertilizer using a lye-water solution, and that hydrochloride gas can be made from salt and a sulfuric-acid based drain opener.  He then identified several items seized by police at the scene and depicted in photographs offered by the State as exhibits.  In particular, he testified that police seized, in Apartment 9, certain material found in the bathtub, a bottle labeled Red Devil Lye, a box labeled to contain salt, a bag labeled to contain fertilizer, a coffee filter containing a brownish tan residue, a measuring cup containing a white residue, a Ziploc bag containing a powdery substance
(footnote: 3) and a receipt for dry ice purchased at Southwest Carbonics.  In addition, Officer Gottlob identified items seized by police and depicted in photographs from Apartment 6, including, among other things, two five-gallon gas cans found in the bathtub with what appears to be fire extinguisher material on top of them and burn marks on the sides, a plastic bag containing plastic buckets and some hoses and funnels, a bucket containing a length of coiled up hose and some liquid, three glass jars, a can of camp fuel,
(footnote: 4) and a glass jar containing liquid.  Officer Gottlob also testified that police seized some peeled batteries, i.e., batteries without the metal casing, and mail addressed to Mullins at 124 Roberts Cutoff Road, Apartment 9.

Max Courtney, a forensic chemist, testified that he collected samples and performed a chemical analysis on items found in Apartments 6 and 9, dusted all items found with printable surfaces for fingerprints, and dusted for fingerprints in Apartments 6 and 9.  He testified that he obtained prints from a one gallon Crown camp fuel can and from three one-gallon glass jars.  In addition, he testified that he found pseudoephedrine, some trapped ammonia, and a volatile hydrocarbon consistent with mineral spirits, which would be consistent with camp fuel, in the clumped material taken from near the drain of the bathtub of Apartment 9.  Courtney testified that pseudoephedrine is an immediate precursor to methamphetamine and that this type of material was consistent with what is left over from the actual cooking of methamphetamine.  He testified that he believed that the clump of material in the bathtub was the product of a “methamphetamine synthesis from pseudoephedrine via the Nazi method.”  He also testified that he found both methamphetamine and pseudoephedrine in one of the glass jars, labeled by him as item number three.  He described the material in the jar as being a “typical Nazi by-product.”  In a jar labeled item number five, Courtney stated that he found a mixture of solvent or crystals and liquid.  He stated that he stirred it up and took a sample and that that sample contained petroleum distillate, pseudoephedrine, and .06 percent methamphetamine by weight.  He indicated that would equate to about .21 grams of methamphetamine in approximately one-half of the liquid present in the jar or .42 grams total.  He testified that the coffee filter yielded .19 grams of material containing methamphetamine and pseudoephedrine.  Courtney also testified that he found 2.4 percent pseudoephedrine in a plastic bag of granular material weighing 171.21 grams, opining that the material was the residue from the extraction of pseudoephedrine from between eight hundred to nine hundred cold tablets.  Courtney testified that he found, in total, approximately 2.68 grams of methamphetamine. 

Finally, Courtney testified that he believed that Apartments 6 and 9 were the site of a clandestine methamphetamine lab and that methamphetamine was being produced utilizing the Birch-Bekenzer reduction reaction method, commonly referred to as the Nazi method.  He testified that all the necessary ingredients to manufacture methamphetamine were found in Apartments 6 and 9 and that the remnants found in Apartments 6 and 9 were consistent with the manufacture of between four and two hundred grams of methamphetamine. 

Frank Shiller, testifying as a fingerprint expert, told the jury that he identified Mullins’s fingerprint on the glass jar labeled item number five and that he identified the fingerprint of Joe Don Hindman on the Crown camp fuel can. 

The court’s charge included a charge on the law of parties.  Mullins did not object to the inclusion of the parties instruction in the charge. 
 

III.  Sufficiency of the Evidence

In his first four issues, Mullins attacks the legal and factual sufficiency of the evidence.  In issues one and two, Mullins contends generally that the evidence is legally and factually insufficient to support his convictions.  In his third issue, Mullins contends that the evidence is insufficient to support his conviction for the manufacture of methamphetamine because the State offered no evidence explaining “chemical synthesis” or proving that chemical synthesis was the method or manner used to manufacture methamphetamine in this case.  In his fourth issue, Mullins contends that the evidence is legally and factually insufficient to support his convictions as a party because the State failed to prove the identity, and therefore the guilt, of Joe Don Hindman, the third party for whom the State alleged Mullins was criminally responsible. 
 

The court’s charge authorized the jury to convict Mullins either as a principal or as a party to the manufacture  of one to four grams of a controlled substance, namely methamphetamine, and of the possession of a precursor to methamphetamine, namely  pseudoephedrine, with the intent to manufacture methamphetamine.
 
 
See
 
Tex. Health & Safety Code Ann.
 § 481.112 (Vernon 2003), § 481.124 (Vernon Supp. 2004-05).  The jury returned a general verdict finding Mullins guilty of both offenses.  When, as here, the jury is authorized to convict on any one of several theories or methods of commission of the same crime and returns a general verdict of guilt, it does not matter that the evidence is insufficient to sustain one or more of the theories, so long as the evidence is sufficient to sustain the conviction under at least one theory.  
See Brooks v. State
, 990 S.W.2d 278, 283 (Tex. Crim. App.), 
cert denied
, 528 U.S. 956 (1999); 
Kitchens v. State
, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (plurality op.), 
cert. denied
, 504 U.S. 958 (1992).  Thus, we will first apply the legal and factual sufficiency standards of review to the evidence of Mullins’s guilt as a party to the offenses. 

A.  Legal Sufficiency—Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

B.  Factual Sufficiency—Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.    In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

C.  Analysis

1.  The Law of Parties

Texas law provides that a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, 
by the conduct of another for which he is criminally responsible, or by both. 
 Tex. Penal Code Ann
. § 7.01(a) (Vernon 2003).  Moreover, a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  
Id
. §
 7.02(a)(2). 

For a person to be guilty under the law of parties, the State must first prove the guilt of another as the primary actor.  
Richardson v. State
, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993), 
cert. denied
, 513 U.S. 1085 (1995).  The State need not identify the primary actor to justify a jury charge on the law of parties; rather, it is sufficient that the State proves conduct by a third party constituting the offense and an act by the accused committed with the intent to promote or assist the conduct.  
See Perry v. State
, 977 S.W.2d 847, 850 (Tex. App.—Houston [14th
 Dist.] 1998, no pet.).  

In determining whether a defendant was a party, the trial court may look to events before, during, and after the commission of the crime.  
Goff v. State
, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996), 
cert. denied
, 520 U.S. 1171 (1997). 
 Mere presence at the scene of an offense is insufficient to establish liability as a party. 
 Beardsley v. State
, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987)
.  
However, a
 person’s presence at the scene of an offense is a “circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant.”  
Id
.  Participation need not be proven by direct evidence; circumstantial evidence may be sufficient to show a person is a party to an offense.  
See id. 
at 684.
 
The evidence must show that at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose.  
Burdine v. State
, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986), 
cert. denied
, 480 U.S. 940 (1987). 

2.  Application to the Facts

Here, the court’s charge included an instruction on the law of parties.  The 
application paragraph of the court’s charge relevant to the manufacturing charge instructed the jury as follows: 

Now bearing in mind the foregoing instructions, if you believe from 
the evidence beyond a reasonable doubt that the defendant, Henry Franklin Mullins, Jr., on or about the 27th 
day of December 2002, in Tarrant County, Texas, did then and there intentionally or knowingly manufacture a controlled substance, namely methamphetamine of one gram or more but less than four grams, including any adulterants or dilutants, by producing, preparing or processing said controlled substance, independently by means of chemical synthesis; OR if you believe from the evidence beyond a reasonable doubt that Joe Don Hindman, on or about the 27th
 day of December, 2002, in Tarrant County, Texas, did then and there intentionally or knowingly manufacture a controlled substance, namely methamphetamine of one gram or more but less than four grams, including any adulterants or dilutants, by producing, preparing or processing said controlled substance, independently by means of chemical synthesis, and that Henry Franklin Mullins, Jr., acting with intent to promote or assist the commission of the offense, did encourage, aid or attempt to aid said Joe Don Hindman to commit said offense; then you will find the Defendant “Guilty” of the offense of manufacture of a controlled substance, namely methamphetamine of one gram or more but less than four grams, as charged in the first count of the indictment. 

A similar charge was given the jury on the offense of possession of a precursor to methamphetamine, namely pseudoephedrine, with intent to manufacture methamphetamine.
 

With respect to the sufficiency of the evidence to support his convictions as a party, we interpret Mullins’s issues as challenging the sufficiency of the evidence to prove (1) the identity of Joe Don Hindman, (2) that the methamphetamine in this case was manufactured by chemical synthesis, and (3) that he, with the intent to promote or assist in the commission of the offenses, did encourage, aid, or attempt to aid Hindman to commit the offenses.
 

a.  Identity of the Third Party

We first address Mullins’s contention that there is insufficient evidence to support his convictions as a party because there is insufficient evidence establishing the identity, and therefore the guilt, of Joe Don Hindman.  In support of his position, 
Mullins argues that the State failed to prove that Hindman, the party named in the jury instruction on the law of parties, was present at the apartments located at 124 Roberts Cutoff on the day of the fire.  In that regard, Mullins points out that Duncan and Perkins testified regarding the acts of a person named “Joe” or “Joe Don” on the day of the fire but that neither identified the person they saw as “Joe Don Hindman.”  Mullins acknowledges that fingerprint expert Frank Shiller testified that he found the fingerprint of Joe Don Hindman on a one-gallon fuel can seized by police at the scene, but argues that Schiller’s testimony alone is insufficient to prove that Hindman was present on the day of the fire.  We disagree.

Witness Perkins testified that on the day of the fire he observed smoke coming out of Apartment 9 and that he saw Mullins’s roommate, whom he knew as “Joe,” take a five-gallon can from Mullins’s apartment to the dumpster.  A similar identification was made by apartment manager Duncan when she identified the person with Mullins that day as someone who occasionally stayed with Mullins and whom she knew as “Joe” or “Joe Don.”  In addition, Officer Gottlob testified that police seized a camp fuel can at the scene after it had been recovered by a firefighter from the dumpster, and fingerprint expert Frank Schiller testified that he identified a fingerprint found on the camp fuel can to be that of Joe Don Hindman.  Considered together, this is sufficient evidence from which a rational jury could have concluded that the third party identified in the charge as Joe Don Hindman was the party identified by the witnesses as “Joe” or “Joe Don.”  
Further, we believe that even if the name of the third party contained in the jury charge was technically incorrect, there was no error because based upon the testimony and evidence in this case, it would have been clear to the jury who the third party was. 
 See
 
Green v. State
,
 
930 S.W.2d 655, 658 (Tex. App.—Fort Worth 1996, pet. ref’d) (holding that the failure of the trial court to specifically name any other party in the application paragraph of the jury charge was not error because based on the testimony and argument, the jury was not confused as to who the parties were).

b.  Sufficiency of the Evidence to Prove Manufacture by Chemical Synthesis

The record reflects that Mullins was charged with and convicted of manufacturing methamphetamine by “chemical synthesis.”  
Section 481.002 of the Texas Health and Safety Code defines “manufacture” as

the production, preparation, propagation, compounding, conversion, or processing of a controlled substance other than marihuana, directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes the packaging or repackaging of the substance or labeling or relabeling of its container. 

 
 

Tex. Health & Safety Code Ann.
 § 481.002(25) (Vernon Supp. 2004-05).  
The Texas Health and Safety Code does not, however, define what constitutes chemical synthesis.
  
See id
. § 481.002.
 
 

Mullins argues that the evidence is insufficient to support his conviction for the manufacture of methamphetamine because the State failed to explain chemical synthesis or prove that chemical synthesis was the method or manner used to manufacture methamphetamine in this case.
  However, Mullins fails to provide us with any authority to support his assertion that the State was required to define or otherwise explain the meaning of chemical synthesis, and we find no case standing for such a proposition.
(footnote: 5)  Further, we believe that there exists both legally and factually sufficient evidence in the record from which a rational jury could have concluded that the methamphetamine in this case was manufactured by chemical synthesis. 

At trial, Officer Gottlob testified in detail regarding the procedure and process for manufacturing methamphetamine using the Nazi or Birch reduction method.  Courtney, the State’s chemist, testified that he performed a chemical analysis on various items seized by police from Apartments 6 and 9 and that, in total, he found approximately 2.68 grams of methamphetamine.  He also testified that all the materials necessary to manufacture methamphetamine were found in Apartments 6 and 9, that he believed that Apartments 6 and 9 were the site of a clandestine methamphetamine lab, that the methamphetamine was being produced utilizing the Birch-Bekenzer reduction method, commonly known as the Nazi method, and that the remnant materials found in the apartments were consistent with the manufacture of between four and two hundred grams of methamphetamine.  He also testified that he believed that the clump of material found in the bathtub of Apartment 9 was the product of a “methamphetamine synthesis from pseudoephedrine via the Nazi method.”  Finally, Courtney described the material found in one of the jars seized from the apartments as being a “typical Nazi by-product.”  This is sufficient evidence from which a rational jury could have found that the methamphetamine seized by police at the scene was manufactured by chemical synthesis. 

c.  Evidence that Mullins Acted as a Party to the Offenses

Finally,
 because we interpret Mullins’s challenge to the sufficiency of the evidence to include the allegation that there is insufficient evidence that he participated in the offenses as a party, we address whether there is legally and factually sufficient evidence to prove that Mullins, with the intent to promote or assist the commission of the offense, encouraged, aided or attempted to aid Joe Don Hindman in committing the offenses.  

Here, the record contains substantial evidence that Mullins was, if not a principal, a party to the offenses.  The record reflects that Mullins was leasing the apartment where the fire took place and where police found not only remnants from the manufacture of methamphetamine, but methamphetamine and pseudoephedrine, a precursor to methamphetamine.  The record also reflects that Mullins was living in Apartment 9 at the time of the fire, that he received his mail there, and that he was present at the time of the explosion and fire, albeit standing by the stairs outside the apartment talking to Duncan from whom he had just borrowed a mixer.
(footnote: 6)  The record further reflects that after the explosion Mullins ran inside the apartment, returned to ask Duncan for a fire extinguisher, and that he told Duncan not to call the fire department.  In addition, there was testimony indicating that after Duncan told Mullins that she was going to call the fire department, Mullins and Hindman moved several items from inside Apartment 9 to Apartment 6, a vacant apartment.  There was also evidence that Mullins and Hindman left the scene together before the fire department arrived, telling Duncan that they were going to “get some stuff to fix the bathroom.”  Finally, the record reflects that Mullins’s fingerprint was found on a glass jar seized by police from Apartment 6 and that the jar contained  methamphetamine.  This is sufficient evidence from which a rational jury could have found that Mullins, at the very least, acted with the intent to promote or assist in the commission of the offenses by encouraging, aiding, or attempting to aid Joe Don Hindman in committing the offenses, i.e., that he was encouraging, aiding, or attempting to aid Hindman in the unlawful manufacture of methamphetamine, and in the possession of pseudoephedrine, with the intent to manufacture methamphetamine.
 
 
See Goff
, 931 S.W.2d at 545; 
Beardsley
, 738 S.W.2d at 684-85; 
Burdine
, 719 S.W.2d at 315; 
see also East v. State
, 722 S.W.2d 170, 171-72 (Tex. App.—Fort Worth 1986, pet. ref’d) (holding evidence sufficient to support conviction for manufacturing amphetamine when two defendants were present in a mobile home that contained a drug laboratory, defendants had custody and control of mobile home, the laboratory had been used by a third person to manufacture amphetamine, and odor associated with the manufacture of drugs was present at the time of the defendant’s arrests).

Thus, applying the proper standards of review, we hold there to be legally and factually sufficient evidence to support Mullins’s convictions as a party.   As such, we need not determine whether there is legally and factually sufficient evidence to support his convictions as a principal.  
See Brooks
, 990 S.W.2d at 283; 
Kitchens
, 823 S.W.2d at 258.  We overrule Mullins’s first four issues.  

IV.  Jury Charge

In his fifth issue, Mullins contends that the trial court erred by including in the jury instructions an instruction on the law of parties.  Specifically, Mullins contends that the trial court erred because there was insufficient evidence raising the issue of whether Mullins acted as a party to the charged offenses.

A.  Standard of Review

Appellate review of error in a jury charge involves a two-step process.  
Abdnor v. State
, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error occurred.  If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.  
Id.
 at 731-32.  Error preservation does not become an issue until harm is assessed because the degree of harm necessary depends on whether the defendant preserved error.  
Ngo v. State
, No. PD-0504-04, 2005 WL 600353, at *3 (Tex. Crim. App.  March 16, 2005); 
Middleton v. State
, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

B.  Analysis 

A trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence.  
Taylor v. State
, 856 S.W.2d 459, 470 (Tex. App.—Houston [1st Dist.] 1993), 
aff'd
, 885 S.W.2d 154 (Tex. Crim. App. 1994); 
see
 
Tex. Code Crim. Proc. Ann.
 art. 36.14 (Vernon Supp. 2004-05); 
Jackson v. State
, 633 S.W.2d 897, 899 (Tex. Crim. App. 1982).  
If evidence presented at trial raises an issue, and a jury charge is requested on that issue, then a charge on that issue must be given. 
 Taylor, 
856 S.W.2d at 470.
 
 An instruction on the law of parties may be given when 
there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties. 
 Ladd v. State,
 3 S.W.3d 547, 564 (Tex. Crim. App. 1999)
. 

Because we hold, in response to Mullins’s challenges to the sufficiency of the evidence, that there exists both legally and factually sufficient evidence in the record to support Mullins’s conviction as a party to the offenses, we hold that the trial court did not err by including an instruction in the jury charge on the law of parties.  
See Ladd
, 3 S.W.3d at 564.  We overrule Mullins’s fifth issue.  

V.  Conclusion

Because we overrule Mullins’s five issues, we affirm the trial court’s judgment. 

BOB MCCOY

JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

PUBLISH

DELIVERED:  August 25, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Officer Gottlob testified that the cold tablets are ground up to a powder and then alcohol or methanol is used to extract the pseudoephedrine.  He stated that he has seen “food processors, coffee grinders and even hammers . . . used to mash them up.”

3:
Officer Gottlob testified that the Ziploc bag containing the powdery substance was found inside a pair of mens extra-large coveralls.  He indicated that he believed the coveralls belonged to Mullins based upon the size of the coveralls relative to the size of the two suspects in this case.  He also testified that he found a photo ID of Mullins inside a pocket of the coveralls.  

4:
Officer Gottlob testified that the can of camp fuel found in Apartment 6 by police had been placed there by a firefighter who retrieved it from the dumpster.

5:
In addition, we note that Mullins did not object to the jury charge or otherwise request that the trial court include a definition of chemical synthesis in the instructions given the jury.   

6:
As previously stated, the record reflects that Mullins attempted to borrow a blender from Duncan, but that instead Duncan loaned him a mixer because Mullins had said he was making a cake.  The record also reflects that Hindman was with Mullins at the time Duncan gave him the mixer, that Hindman left with the mixer while Mullins and Duncan continued to talk, and that the explosion occurred while Mullins and Duncan were talking.